**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM MILLS, | **Case No.:** |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | FCRA, 15 U.S.C. §§ 1681 *et seq.* |
| EXPERIAN INFORMATION SOLUTIONS INC., EQUIFAX INFORMATION SERVICES LLC, TRANS UNION LLC and BERKSHIRE BANK, | |
| Defendants. | |

William Mills, the Plaintiff herein, by his attorneys, as and for his complaint against the Defendants EXPERIAN INFORMATION SOLUTIONS INC. ("Experian"), EQUIFAX INFORMATION SERVICES LLC ("Equifax"), TRANS UNION, LLC ("Trans Union"), and BERKSHIRE BANK ("Berkshire"):

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory and punitive damages, costs and attorneys' fees brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §§ 1681a–x and for the common-law tort of defamation.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. The Act likewise demands that consumers' disputes of inaccurate information be taken seriously by industry players, requiring that they do much more than simply pass information between themselves electronically without actually investigating the

substance of a consumer's dispute and consider all information available in conducting such investigations.

4.  Plaintiff is the victim of what is now a common crime—identity theft. A fraudster used Plaintiff's personal information to open credit account with Berkshire without Plaintiff's knowledge or consent.

5.  Plaintiff has asserted the factual truth—the account did not belong to him, and he did not authorize it. Yet Berkshire continued to press on.

6.  Berkshire also reported the inaccurate account to Experian, Equifax and Trans Union. Plaintiff disputed the inaccuracies to them as well, to no avail.

7.  The FCRA demands of reporting agencies like Experian, Equifax and Trans Union that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agencies must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

8.  Also, when a consumer disputes the accuracy of information with the agencies, they must transmit that dispute to the entity who furnished the information, here Berkshire. Berkshire, the furnisher, must then conduct its own, independent investigation of the dispute. *Id.* § 1681s-2(b).

9.  Plaintiff brings claims under Section 1681e(b) against Experian, Equifax and Trans Union because they reported about Plaintiff inaccurate information regarding the Berkshire account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

10. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).  This is particularly true as to how Experian has complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Experian has been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had it followed that advice and heeded those warnings, the Plaintiff would not have been harmed. The FCRA demands of reporting agencies like Experian, Equifax and Trans Union that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

## JURISDICTION

11. The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. § 1367.

12. Venue is proper in this District per 28 U.S.C. § 1391, as the acts, omissions and transactions that give rise to this action occurred, in substantial part, in this District.

13. Venue is also proper in this district because Plaintiff lives in this District, Defendants conduct business in this District, and the injury occurred in this District.

14. Defendants transact business in the State of New York. Defendants are registered to conduct business and have appointed registered agents in the State of New York.

**PARTIES**

15. Plaintiff is a natural person residing in Erie County, New York.

16. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c).

17. Defendant Experian Information Solutions Inc. is headquartered in California and does business in the State of New York through it registered agent located in New York, New York.

18. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

19. Defendant Trans Union LLC is headquartered in Illinois and does business in the State of New York through its registered agent located in Albany, New York.

20. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

21. Defendant Equifax Information Services LLC is headquartered in Georgia and does business in the State of New York through its registered agent located in Albany, New York.

22. Equifax is a "credit reporting agency," as defined in 15 U.S.C. § 1681a(f) and it disburses consumer reports to third parties for monetary compensation.

23. Defendant Berkshire is a foreign business corporation organized under the laws of the State of Delaware with its principal place of business at 60 State Street, Boston, Massachusetts 02109. Defendant is authorized to do business in the State of New York.

24. At all times relevant hereto, Berkshire in the ordinary course of business, regularly extends open-ended consumer credit which is payable by agreement in more than four

installments or for which the payment of a finance charge is or may be required and is the person to whom the debt arising from the consumer credit transaction is initially payable by agreement and is a "person" as defined by 15 U.S.C. § 1681 (b).

25. Defendants acted through their agents, employees, officers, members, directors, heirs, predecessors, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

26. Defendants are subject to jurisdiction in the State of New York and venue of this District pursuant to New York Long Arm jurisdiction statute through the causation of injury in the state by acts or omissions inside and outside of the State of New York.

## GENERAL FACTUAL ALLEGATIONS

*Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

27. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001)."In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v.*

*Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

28. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."
*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

29. Section 1681i(a), on the other, hand requires much more from a CRA after consumer has placed it on notice of an inaccuracy through his/her dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . .  before the end of the 30-day period[.]
*15 .S.C. § 1681i(a)(1)(A).*

30. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

31. It has long been the law that a CRA, such as Experian, Equifax, or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g., Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed

debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

32. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).

33. As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); *see* Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 3d 426, 430 (4th Cir. 2004).

34. Further, as the CRA Defendants are aware, courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

35. It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

36. Today, furnishers such as Berkshire, and other of the CRA Defendants' furnishers have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### *Plaintiff Discovers The Fraudulent Account*

37. Sometime in or around July 2023, Plaintiff discovered that he was the victim of what is now a common crime—identity theft. A fraudster used Plaintiff's personal information to open a credit account with a financial institution without Plaintiff's knowledge or consent.

38. Upon discovery of the crime, Plaintiff immediately filed a report with his local police department.

---

[1]  Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

39. Plaintiff discovered that the unauthorized account belonged to Berkshire ("Account").

40. Upon discovering the fraudulent debt, Plaintiff immediately disputed the debt with the actual account holder, to no avail.

41. Mr. Mills disputed the fraudulent account with Berkshire, in which he explained that he was the victim of identity theft and he never applied for any loans with Berkshire, nor did he authorize the unlawful account.

42. However, Berkshire continued to press on, erroneously deeming Plaintiff responsible for the unauthorized account.

43. Plaintiff then pulled his Experian, Trans Union and Equifax consumer reports and discovered Berkshire was reporting fraudulent account.

44. Plaintiff disputed the debts with Experian, Trans Union and Equifax.

45. The Plaintiff has never applied for, opened, authorized, nor used this account at all.

### *Plaintiff Disputes the Inaccuracies With the CRAs*

46. Having learned that Berkshire was inaccurately reporting the status of the account to the Experian, Equifax and Trans Union, Plaintiff sent disputes to Experian, Equifax and Trans Union to attempt to have them remove the inaccuracies from his credit reports.

47. On or around March 2024 and sometime in 2023, Plaintiff sent correspondence to Experian, requesting that Experian verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

48. Within those letters, Mr. Mills explained that the inaccuracies Experian was attributing to the Berkshire account was due to identity theft and the account did not belong to him.

49. The information furnished by Berkshire to Experian, was at all times inaccurate. Plaintiff's identity was stolen to open the account.

50. On or about a date better known to Experian and Berkshire, Experian furnished Plaintiff's disputes to Berkshire using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Experian.

51. e-Oscar is also the system by which Berkshire has agreed they will accept such consumer disputes from Experian.

52. Under such circumstances, Berkshire became obligated under the FCRA to investigate Plaintiff's disputes.

53. On or around March 2024 and sometime in 2023, Plaintiff sent correspondence to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

54. Within those letters, Mr. Mills explained that the inaccuracies Equifax was attributing to the Berkshire account was due to identity theft and the account did not belong to him.

55. The information furnished by Berkshire to Equifax, was at all times inaccurate. Plaintiff's identity was stolen to open the account.

56. On or about a date better known to Equifax and Berkshire, Equifax furnished Plaintiff's disputes to Berkshire using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Equifax.

57. e-Oscar is also the system by which Berkshire has agreed they will accept such consumer disputes from Equifax.

58. Under such circumstances, Berkshire became obligated under the FCRA to investigate Plaintiff's disputes.

59. On or around April 2024, March 2024 and sometime in 2023, Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

60. Within those letters, Mr. Mills explained that the inaccuracies Trans Union was attributing to the Berkshire account was due to identity theft and the account did not belong to him.

61. The information furnished by Berkshire to Trans Union, was at all times inaccurate. Plaintiff's identity was stolen to open the account.

62. On or about a date better known to Trans Union and Berkshire, Trans Union furnished Plaintiff's disputes to Berkshire using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to Trans Union.

63. e-Oscar is also the system by which Berkshire has agreed they will accept such consumer disputes from Trans Union.

64. Under such circumstances, Berkshire became obligated under the FCRA to investigate Plaintiff's disputes.

65. Subsequent to Plaintiff's disputes, Experian, Equifax and Trans Union failed to remove the inaccurate information regarding the fraudulent Berkshire account contained within Plaintiff's credit reports.

### *Disputes With Berkshire*

66. Upon discovering the identity theft, Plaintiff immediately disputed the fraudulent account with Berkshire.

67. Berkshire denied the Plaintiff's claim.

68. A check of his consumer files maintained by Experian, Equifax and Trans Union revealed that Berkshire was furnishing information about an account to Experian, Equifax and Trans Union, as belonging to the Plaintiff.

69. The information furnished by Berkshire to Experian, Equifax and Trans Union, was at all times inaccurate. Plaintiff's identity was stolen to open this account.

70. On or around March 2024 and sometime in 2023, Plaintiff sent correspondence dated to Experian, requesting that Experian verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

71. On or about a date better known to Experian and Berkshire, Experian furnished Plaintiff's dispute to Berkshire via e-Oscar.

72. Berkshire failed to reasonably reinvestigate Plaintiff's disputes that Berkshire received from Experian in violation of the FCRA.

73. At the date of this filing, Berkshire has failed to reasonably reinvestigate into Plaintiff's disputes and has failed to accurately correct and update or delete Plaintiff's information.

74. On or around March 2024 and sometime in 2023, Plaintiff sent correspondence to Equifax, requesting that Equifax, verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

75. On or about a date better known to Equifax and Berkshire, Equifax furnished Plaintiff's disputes to Berkshire via e-Oscar.

76. Berkshire failed to reasonably reinvestigate Plaintiff's disputes that Berkshire received from Equifax in violation of the FCRA.

77. At the date of this filing, Berkshire has failed to reasonably reinvestigate into Plaintiff's disputes and has failed to accurately correct and update or delete Plaintiff's information.

78. On or around April 2024, March 2024 and sometime in 2023, Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Berkshire on his credit file.

79. On or about a date better known to Trans Union and Berkshire, Trans Union furnished Plaintiff's disputes to Berkshire via e-Oscar.

80. Berkshire failed to reasonably reinvestigate Plaintiff's disputes that Berkshire received from Trans Union in violation of the FCRA.

81. At the date of this filing, Berkshire has failed to reasonably reinvestigate into Plaintiff's disputes and has failed to accurately correct and update or delete Plaintiff's information.

### The CRA Defendants Did Not And Do Not Conduct Any Investigation Of Most Consumer Disputes

82. Unknown to the Plaintiff until this lawsuit, it has long been the practice of both Trans Union and Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both these Defendants use the same vendor, previously known as Intelenet Global Services and now as Teleperformace.

83. It has long been the practice of Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to an affiliated company, Experian Services Chile, S.S. in Santiago, Chile.[2]

84. The CRAs' dispute processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

85. In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human

---

[2] Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). In recent litigation by Plaintiff's Counsel in the Eastern District of Virginia, *Sublett v. Nissan of Richmond, et al.*, No. 3:20-cv-00156 (E.D. Va.), however, Experian presented the supposed third-party Chilean dispute investigator pursuant to Plaintiff's notice of deposition under Rule 30. To the extent Experian would argue here that it cannot produce the Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the theory that no investigation was conducted by the CRA.

hands or being read by human eyes at Equifax or Trans Union. It gets sent to Defendants' creditor customer for its sole review and consideration.

86. Here is how it the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.   That mailbox company receives consumer disputes, scans them into a batch of other disputes.

87. Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania. Experian's dispute processing simply takes the disputes out of its hands and places them into what Experian has argued is an unrelated third party.

88. Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

89. Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

90. Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just

this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

91. Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

92. Regardless of whether these statements are correct, both Equifax and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

93. Equifax and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

*Plaintiff Suffered Actual Harm*

94. Defendants have continued to report the erroneous account on the Plaintiff's credit reports, despite being notified that Plaintiff was a victim of identity theft.

95. Plaintiff has been attempting to resolve these matters with Defendants for over a year and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

96. As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a. Stress associated with multiple lost opportunities for personal loans, credit cards, and delays in applying for future lines of credit;

   b. Stress associated with loss of pre-existing credit through no fault of his own. Credit accounts which were in good standing were closed by the credit grantors;

   c. Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

   d. Excessively high vehicle insurance rates;

   e. Unable to obtain or maintain business/commercial loans with financial intuitions;

   f. Forced to obtain hard money loans with damaging terms attached, from unconventional sources;

   g. Loss of time attempting to cure the errors;

   h. Significant mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

   i. Stress associated with plethora of hours attempting to resolve this matter in the last three years.

### *Defendants' Conduct Was Willful*

97. The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

98. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

99. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

100.   The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

101.   Just in federal court alone, during the last decade the creditor-furnishers disputed by Plaintiff has had to defend collectively over 1,000 consumer lawsuits.

102.   In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

103.   The CRA Defendants knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

104.   The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

105.    Each Defendant regularly receives unredacted consumer dispute details from this database.

106.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

107.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

108.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

109.    Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

110.    Just in the last 12 months alone, Experian, Equifax, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

111.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

112.    Experian and Equifax have had actual notice from numerous other courts that their

blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*,

431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by

[the FCRA] must consist of something more than merely parroting information

received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x

896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or.

Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably

under the FCRA by deferring entirely to another source of information."); *Bradshaw v.

BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)

("[Equifax] instead utilized an automated dispute system to verify the accuracy of

plaintiffs' account. Many courts, including this one, have concluded that where a CRA

is affirmatively on notice that information received from a creditor may be suspect, it

is unreasonable as a matter of law for the agency to simply verify the creditor's

information through the ACDV process without additional investigation.").

113.    Equifax has even been warned by its home District Court, the Northern District of

Georgia, which detailed:

Equifax argues that the creditor is the party responsible for investigating the
dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b)
(1998). According to Equifax, the reporting agency's duty under § 1681i is
fulfilled once it forwards the complaint to the creditor, the entity in the best
position to undertake an accurate investigation. Under § 1681s-2(b), furnishers
of information, such as creditors, have certain duties to investigate consumers'
disputes. Yet, this does not end the inquiry, or establish that the reporting
agency has no responsibility beyond serving as a conduit for consumers'
complaints.

To the contrary, a credit reporting agency does not conduct a reasonable
investigation by deferring entirely to another source of information. "In a
reinvestigation of the accuracy of credit reports, a credit bureau must bear some
responsibility for evaluating the accuracy of information obtained from
subscribers." *Stevenson*, 987 F.2d at 293. The FCRA "places the burden of
investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC*

*Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

114.    Trans Union has long been on even clearer notice.  The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  Trans Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007)

115.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

116.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

117.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering – even creating a "working group" to address these issues,

---

[3]     *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

118.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading egal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

119.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

120.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

121.    Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

122.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## **CLAIMS FOR RELIEF**

### **COUNT 1: AGAINST EXPERIAN, EQUIFAX, AND TRANS UNION**
### **Violation of § 1681e(b) of the FCRA**

123.    Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

124.    Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum

possible accuracy in the preparation of the consumer reports and consumer files they published and maintained concerning the Plaintiff.

125.    As a result of this conduct, action and inaction of Experian, Equifax and Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, higher interest rates, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

126.    Further, after the Plaintiff's detail disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Equifax and Trans Union ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

127.    Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

128.    Experian's, Equifax's and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

129.    As a result of Experian's, Equifax's, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover their actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

130.   The Plaintiff is entitled to recover costs and attorney's fees from Experian, Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT 2: AGAINST EXPERIAN, EQUIFAX, AND TRANS UNION
### Violation of § 1681i of the FCRA

131.   Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

132.   Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of the Plaintiff's credit files.

133.   Furthermore, Experian, Equifax and Trans Union violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party—the consumer reporting agency who received the disputes—must investigate those disputes. The statute does not contemplate someone other than Experian, Equifax or Trans Union conducting the investigation.

134.   Yet, both Equifax and Trans Union used an unrelated third-party, Intelenet, over which neither CRA has control to conduct its investigations. Intelenet is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

135.   As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

136.   Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

137.   The Plaintiff is entitled to recover costs and attorneys' fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT 3: AGAINST BERKSHIRE
### Violation of § 1681s-2(b)(1)(A) of the FCRA

138.   Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

139.   The FCRA requires that "After receiving notice of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A).

140.   It is evident that Defendant Berkshire failed to fully conduct a reasonable investigation of the Plaintiff's disputes after said dispute was furnished to Berkshire by Experian, Equifax and Trans Union, as required by 15 U.S.C. § 1681s-2(b)(1)(A).

141.   As a result of the above-described violation to §1681s-2(b)(1)(A), Plaintiff has sustained damages including loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for

various financial products, higher interest rates, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

142.    Defendant Berkshire's conduct was a direct and proximate cause, as well as a substantial factor, in causing serious injuries, damages and harm to Plaintiff that are outlined more completely above.

143.    Defendant Berkshire's violative conduct was intentional, willful and negligent.

144.    The violations by Berkshire were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Berkshire was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

145.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Berkshire in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT 4: AGAINST BERKSHIRE**
**Violation of § 1681s-2(b)(1)(E) of the FCRA**

146.    Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

147.    Defendant Berkshire violated FCRA § 1681s-2(b)(1)(E).

148.    The § 1681s-2(b)(1)(E) of the FCRA provides that if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation, for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly modify that

item of information; delete that item of information; or permanently block the reporting of that item of information.

149.    Defendant Berkshire failed to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's disputes from Experian, Equifax and Trans Union prior to the commencement of this action any as required by 15 U.S.C. § 1681s-2(b)(1)(E).

150.    As a result of the above-described violation to §1681s-2(b)(1)(E), Plaintiff has sustained damages including loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, higher interest rates, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

151.    Defendant Berkshire's conduct was a direct and proximate cause, as well as a substantial factor, in causing serious injuries, damages and harm to Plaintiff that are outlined more completely above.

152.    Defendant Berkshire's violative conduct was intentional, willful and negligent.

153.    The violations by Berkshire were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Berkshire was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

154.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Berkshire in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## **JURY DEMAND**

155.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff William Mills hereby

demands a trial by jury of all issues triable by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff William Mills respectfully requests judgment be entered

against Defendants for the following:

A.  Declaratory judgment that Defendants violated the FCRA;

B.  Actual damages pursuant to 15 U.S.C. §1681n(a);

C.  Statutory damages pursuant to 15 U.S.C. §1681n(a)(1)(A);

D.  Punitive damages pursuant to 15 U.S.C. §1681n(a)(2);

E.  Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§1681n(c) and
1681o(b);

F.  Awarding Plaintiff any pre-judgment and post-judgment interest as may be
allowed under the law;

G.  Specific performance and injunctive relief; and

Dated: June 25, 2024
       New York, New York


                                        **LAW OFFICE OF ABEL L. PIERRE,**
                                        **ATTORNEY-AT-LAW, P.C.**


                                        Attorney I.D.#AP-5508
                                        140 Broadway, 46th Floor
                                        New York, New York 10005
                                        Telephone: (212) 766-3323
                                        Facsimile: (212) 766-3322
                                        abel@apierrelaw.com

                                        *Attorneys for Plaintiff*